1  Steven A. Dillick -- Bar No. 111419
   Law Offices of Steven A. Dillick
2  One Maritime Plaza, Suite 1600
   San Francisco, CA  94111
3  sdillick@ix.netcom.com
   (415) 399-8777
4
   Attorney for Defendant
5  Michael Mak

6

7

8                          UNITED STATES DISTRICT COURT
                          NORTHERN DISTRICT OF CALIFORNIA
9                            SAN FRANCISCO DIVISION

10 MICROSOFT CORPORATION, a
   Washington corporation,                    CASE NO.  07-CV-01840 CW
11
                    Plaintiff,                **DEFENDANTS MICHAEL MAK'S
12                                             RESPONSE TO PLAINTIFF'S
            v.                                 MOTION FOR SUMMARY
13                                             JUDGMENT and
   INTRAX GROUP, INC., d/b/a SURPLUS           MAK'S CROSS-MOTION FOR AND
14 COMPUTERS; MICHAEL MAK; and                 MEMORANDUM IN SUPPORT OF
   JOHN DOES 1-5,                              SUMMARY JUDGMENT**
15
                    Defendants.
16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,
No. 3:07-cv-01840 EMC

# TABLE OF CONTENTS

I. SUMMARY OF ARGUMENT ................................................................................................ 2

    A.   Calling It All "Software" Blurs The "Copy / Copyright" Distinction .................... 2

    B.   The Copy Owner's Right Prevails Over The Copyright Owner's Right .................. 3

    C.   Microsoft's Two-Pronged Attempt to Evade Section 109(a) .................................. 4

    D.   Non-Importers Not Liable for Infringing Distribution By Importer ....................... 6

    E.   All Relevant Public Policy Considerations Favor Mak ......................................... 6

II. MICROSOFT'S EFFORTS TO AVOID SECTION 109 ARE UNAVAILING ................ 6

    A.   Copyrights Are Subject to the Rights of Copy Owners ......................................... 7

        1.   Microsoft Does Not Claim Ownership, Nor Dispute Defendant's Ownership, in the Normal Sense ............................................................................................................... 7

        2.   No Right to License the *Private* Performance of a Work Exists ......................... 9

        3.   Licensing a "Work" Does Not Negate Ownership of a "Copy" ......................... 10

        4.   Copyright Licenses Cannot Circumvent Statutory Limits ................................. 11

    B.   "Under This Title" Cannot Reasonably Mean "In The U.S.A." ........................... 13

        1.   Not Extraterritorial Application of the U.S. Copyright Act ............................... 15

        2.   Microsoft's Interpretation Conflicts with Other Chapters of the Copyright Act ................ 18

    C.   Defendant Is Not Alleged To Have Imported ...................................................... 21

    D.   Other Legal And Public Policy Considerations Favor Defendants ....................... 22

        1.   Society's Interest in Enforcing Microsoft's Copyrights is No Greater than Society's Interest in Preventing Microsoft from Overreaching ............................................................. 23

        2.   Copyright Holders Are Not Exempt From Antitrust Laws ................................. 23

        3.   Microsoft is misusing its Copyrights .................................................................. 24

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,        i
No. 3:07-cv-01840 EMC

TABLE OF AUTHORITIES

**Cases**

*Amer. Int'l Pictures, Inc. v. Foreman*, 576 F. 2d 661 (5th Cir. 1978) ............................2

*Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908)................................................4, 9, 17

*DAK Indus., Inc. v. Microsoft Corp.*, 66 F.3d 1091 (9th Cir. 1995) ............................11

*DSC Communications Corp. v. Pulse Communications, Inc.,* 170 F.3d 1354 (Fed. Cir.) ...............................................................................................................10

*Fogerty v. Fantasy, Inc.,* 510 U.S. 517 (1994)................................................................23

*Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968) ...................10

*Indep. News Co. v. Williams*, 293 F. 2d 510 (3d Cir. 1961) ............................................2

*Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970 (4th Cir. 1990) ............................24

*MGM Studios, Inc. v. Grokster, Ltd.,* 454 F. Supp. 2d. (C.D. Cal. 2006) .....................24

*Microsoft Corp. v. Action Software*, 136 F.Supp 2d 735 (N.D. Ohio 2001) .................10

*Quality King Distributors. Inc. v. L'anza Research Int'l, Inc.,* 523 U.S. 135 (1998) ........................................................................................................................passim

*RCA Mfg. Co. v. Whitman*, 114 F.2d 86 (2d Cir. 1940) ..................................................4

S. Rep. No. 162, 98th Cong., 1st Sess. (1983) .................................................................22

*Schloss v. Sweeney*, 515 F. Supp. 2d 1068 (N.D. Cal. 2007)........................................24

*Softman Prods. Co. v. Adobe Systems, Inc.*, 171 F. Supp 2d 1075 (C.D. Cal. 2001) .....12

*Swatch S.A. v. New City, Inc.*, 454 F. Supp. 2d 1245 (S.D. Fla. 2006)........................15

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975) ....................................10

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,        ii
No. 3:07-cv-01840 EMC

*UMG Recordings, Inc. v. Augusto*, 2008 U.S. Dist. LEXIS 48689 (C.D. Cal. June 8, 2008) ................................................................................................................8

*United States v. Atherton*, 561 F. 2d 747 (9th Cir. 1977) ...............................................8

*United States v. Cohen*, 946 F.2d 430 (6th Cir. 1991) ..................................................11

*United States v. Goss*, 803 F.2d 638 (11th Cir. 1986) ..............................................7, 12

*United States v. Sachs*, 801 F.2d 839 (6th Cir. 1986)..................................................11

*United States v. Wise*, 550 F.2d 1180 (9th Cir. 1977) ...................................................8

**Statutes**

17 U.S.C. § 106...............................................................................................passim

17 U.S.C. § 109(a) ..........................................................................................passim

17 U.S.C. § 121 ....................................................................................................16

17 U.S.C. § 202 ................................................................................................passim

17 U.S.C. § 505 ....................................................................................................25

17 U.S.C. § 602 .................................................................................5, 6, 20, 21

17 U.S.C. §§ 1001-1010 ......................................................................................18

California Penal Code § 653w ..............................................................................15

**Other Authorities**

2 M. Nimmer and D. Nimmer, NIMMER ON COPYRIGHT § 8.12[B][3][c].......................11

H. Rep. 94–1476 .................................................................................................19

J.K. Rowling, HARRY POTTER AND THE DEATHLY HALLOWS (2007)............................25

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,       iii
No. 3:07-cv-01840 EMC

1

Senate Report on the Copyright Act of 1976, 94th Cong., 2nd Sess., Report No. 94-

2

3

   1476 ...........................................................................................................16

4

U.S. Copyright Office, "DMCA Section 104 Report," 78 (2001) .........................passim

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,                iv
No. 3:07-cv-01840 EMC

1  Steven A. Dillick -- Bar No. 111419
   Law Offices of Steven A. Dillick
2  One Maritime Plaza, Suite 1600
   San Francisco, CA  94111
3  sdillick@ix.netcom.com
   (415) 399-8777
4
   Attorney for Defendant
5  Michael Mak

6

7

8              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
9                 SAN FRANCISCO DIVISION

10 MICROSOFT CORPORATION, a
   Washington corporation,                CASE NO.  07-CV-01840 CW
11
                Plaintiff,                 DEFENDANTS MICHAEL MAK'S
12                                         RESPONSE TO PLAINTIFF'S
         v.                                MOTION FOR SUMMARY
13                                         JUDGMENT and
   INTRAX GROUP, INC., d/b/a SURPLUS       MAK'S CROSS-MOTION FOR AND
14 COMPUTERS; MICHAEL MAK; and             MEMORANDUM IN SUPPORT OF
   JOHN DOES 1-5,                          SUMMARY JUDGMENT
15
                Defendants.
16

17

18        There is nothing about  "software" that gives Microsoft rights any greater than the right of a

19 fourth grader over the distribution of lawfully made copies of the fourth grader's three-line haiku

20 poem. Both may be "works of authorship" entitling their respective authors to enjoy the exclusive

21 right to "distribute copies" of their works *subject to* the right of every owner of a lawfully made copy

22 to dispose of it at will. Both may also choose to exercise their right to license the reproduction of the

23 intangible work into another material object, such as paper, plastic discs, or computer hard drives.

24        Just as the fourth grader may give grandmother a copy of the haiku poem on paper, with

25 permission for her to reproduce it onto her hard drive using her scanner, Microsoft may distribute

26 copies of its computer programs on disc, and may include with each copy it sells a license to

27 reproduce it onto a computer hard drive.

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,          1
No. 3:07-cv-01840 EMC

1    But the license to reproduce a poem or program onto a hard drive does not trump the rights

2    Congress made attendant with ownership of the hard drive, the paper, the CD or other material object

3    in which the work is fixed. As will become evident below, Microsoft's position is that if the fourth

4    grader's grandmother happens to be in Ireland when she scans the poem onto her laptop's hard drive,

5    the fourth-grader may sue his grandmother for infringement of his distribution right if she brings her

6    laptop to her son the United States, relying on Microsoft's argument that the copy on her hard drive

7    was made outside of the United States, and therefore 17 U.S.C. § 109(a) does not protect her.

8    Similarly, Microsoft's position effectively gives the fourth grader the right to "license" his

9    grandmother the right to give her copy of the poem solely to a boy, and sue her for infringement if she

10    gives it to a girl instead.

11    Fortunately, § 202 of the Copyright Act (title 17, U.S.C.) states unequivocally that the rights in

12    the copy are distinct from copyrights – that the conveyance of a copy and the licensing of a copyright

13    are two different things, and may be conveyed alone or together. Moreover, conveyance of one has no

14    effect on conveyance of the other. If a copyright owner agrees to license a copyright on condition that

15    the owner of the copy not exercise its § 109(a) right to sell the copy, the owner who does so may

16    breach a contract, but does not infringe a copyright.[1]

17                                    **I. SUMMARY OF ARGUMENT**

18    **A.    Calling It All "Software" Blurs The "Copy / Copyright" Distinction**

19    Microsoft's Complaint and its Motion for Summary Judgment both make heavy use of the term

20    "software" in an apparent effort to conflate these two concepts that the Copyright Act deliberately

21    keeps separate. If we untangle the discs Microsoft sells from the copyrights Microsoft licenses, it will

22    become clear that Microsoft's Motion for Summary Judgment is without merit, and Defendants'

23    Cross-Motion for Summary Judgment should be granted as a matter of law.

---

[1] "Even if the copyright owner places restrictions on the purchaser … the buyer's disregard of the restrictions on resale does not make the buyer or person who buys in the secondary market liable for infringement." *Amer. Int'l Pictures, Inc. v. Foreman*, 576 F. 2d 661, 664 (5th Cir. 1978); *accord Indep. News Co. v. Williams*, 293 F. 2d 510, 517-18 (3d Cir. 1961) (refusing to enforce notice printed on comic books prohibiting resale without a cover).

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,
No. 3:07-cv-01840 EMC

2

1    The Copyright Act does not even use the term "software" at all, except to refer to the

2    "Computer Software Rental Amendments Act of 1990," which is not applicable here. Significantly,

3    that sole reference to "software" is in the context of limiting the scope of the first sale doctrine as

4    codified in § 109 of the Copyright Act with respect to rental of certain types of lawfully made copies

5    of computer programs under § 109(b). Congress understood fully that § 109(a) applied to copies of

6    computer programs without limitation, and therefore an amendment to § 109(a) was necessary if

7    copyright owners had any hope of preventing their rental. The Computer Software Rental

8    Amendments Act would have been unnecessary if copyright owners in computer programs could so

9    easily have achieved the same result by the stroke of a licensing pen or a shift to off-shore

10    manufacturing.

11    Microsoft's rights in its intangible work of authorship, however, are not in issue in this case.

12    No claim is made that Microsoft's works were unlawfully reproduced, performed publicly, or

13    derivative works made from them. Rather, the <u>only</u> copyright in issue in this case is the scope of the

14    exclusive right under Section 106(3) of the Copyright Act to distribute tangible copies of its computer

15    programs.

16    **B.    The Copy Owner's Right Prevails Over The Copyright Owner's Right**

17    The first sale doctrine is an entitlement superior to the copyright. By its express terms, the

18    owner of a lawfully made copy or phonorecord "is entitled, without the authority of the copyright

19    owner, to sell or otherwise dispose of the possession of that copy or phonorecord." Section 109(d)

20    refers back to it as a "privilege," and § 106, from whence all copyrights emanate, begins with the

21    words, "Subject to sections 107 though 122," thereby making Microsoft's copyrights themselves

22    subservient to the "privilege" and "entitlement" given to owners of non-infringing copies. Section

23    109(a) may certainly be raised defensively, but it remains a substantive affirmative right of "copy

24    owners" to which all § 106 rights are subject.

25    "Subject to Sections 107-122" are the words prefacing the grant of each of the exclusive rights,

26    including Microsoft's exclusive right under § 106(3) to distribute copies of its works – *subject to*

27

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,
No. 3:07-cv-01840 EMC                                    3

Section 109, which codifies the first sale doctrine. The Supreme Court drove this home in *Quality King Distributors. Inc. v. L'anza Research Int'l, Inc.,* 523 U.S. 135, 144 (1998) (footnotes omitted):

> [T]he exclusive right to distribute is a limited right. The introductory language in § 106 expressly states that all of the exclusive rights granted by that section – including, of course, the distribution right granted by subsection (3) – are limited by the provisions of §§ 107 through 120. One of those limitations, as we have noted, is provided by the terms of § 109(a), which expressly permit the owner of a lawfully made copy to sell that copy "notwithstanding the provisions of section 106(3)."

The first sale doctrine's limitations on the distribution right of authors has been recognized by federal courts since 1853,[2] and by the Supreme Court since 1908. *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908).[3] It was first codified in the Copyright Act of 1909, and § 27 of the former Act combined the first sale doctrine with the precursor to today's § 202:

> The copyright is distinct from the property in the material object copyrighted, and the sale or conveyance, by gift or otherwise, of the material object shall not of itself constitute a transfer of the copyright, nor shall the assignment of the copyright constitute a transfer of the title to the material object; but nothing in this title shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained.

## C.    Microsoft's Two-Pronged Attempt to Evade Section 109(a)

Because 17 U.S.C. § 106 expressly makes the exclusive right to "distribute copies" of a work, § 106(3), "[s]ubject to Sections 107-122" of the Copyright Act, we begin with Section 109(a), the most recent codification of the "first sale doctrine." If the defendants are owners of copies "lawfully made under this title," it is beyond dispute that they are entitled, without Microsoft's consent, to sell them without Microsoft's permission. To escape that outcome, Microsoft makes two arguments.

First, Microsoft argues that the copies are "licensed, not sold." Microsoft's argument rests on the false notion that "because" it licenses the reproduction of its works onto consumers' hard drives, the Microsoft CDs from which the reproductions are made are not subject to Section 109(a) – at least not if Microsoft says so in the license. But there is nothing at all inconsistent with copies being sold

---

[2] *Quality King*, 523 U.S. at 140 n.4 (citing a half dozen lower court cases from 1853 to 1903).

[3] *See, also, RCA Mfg. Co. v. Whitman*, 114 F.2d 86, 90 (2d Cir. 1940) (Judge Learned Hand refused to enforce a "Not Licensed for Radio Broadcast" notice on RCA's records, concluding that the record company "had no power to impose the pretended servitude upon the records").

1  even though they are conveyed along with licenses respecting copyrights, such as authorization to

2  reproduce them onto other media. Microsoft has presented no argument or evidence that it has retained

3  any ownership interest in the copies. All of the evidence points to defendants as owners of the discs in

4  question, at least up until the point of sale to defendants' customers, who were licensed by Microsoft

5  to install (reproduce) the works onto their hard drives. The law of the Ninth Circuit makes clear that

6  Microsoft cannot alter the ordinary entitlements of ownership as against the copyright owner by self-

7  serving labels or even by enforceable contractual restrictions. At best, Microsoft might have a claim

8  for breach of contract against the party that breached its alleged agreement to suppress price

9  competition, but the other party to the trade-restraint agreement is not before this Court and, in any

10 event, the breach would sound in contract, not copyright infringement.

11      Second, Microsoft argues that this court should ignore § 109(a) because the copies in question

12 were manufactured abroad (albeit with Microsoft's authority). Although the Supreme Court has

13 unequivocally held that § 602 (the importation right) is a mere subset of the § 106(3) distribution right

14 that is subject to § 109, Microsoft implies that because one member of the Supreme Court noted that

15 the facts of that case involved copies manufactured in the United States, the Court implicitly ruled that

16 the opposite outcome would have resulted had the facts involved copies made overseas. There is no

17 logic to such a leap, and its citation to a single case out of the Southern District of Florida that took

18 that leap does not make it any more logical. Microsoft asks this Court to focus solely on § 602, and to

19 ignore the fact that, if its reasoning were to prevail, the first sale doctrine would, *a fortiori*, also have

20 to be judicially abolished for *all* copies manufactured abroad, including those imported by Microsoft

21 itself and sold by Microsoft directly to U.S. consumers. A favorable ruling for Microsoft would make

22 every person who gives away a book, magazine, photograph, sound recording, or pamphlet, run the

23 risk of infringing the distribution right unless they first determined that the item was "made in the

24 U.S.A." Indeed, not even a crust of day old bread could be sold in this country if the *copyrighted label*

25 on the bread was printed in China.

26

27

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,        5
No. 3:07-cv-01840 EMC

1

**D.      Non-Importers Not Liable for Infringing Distribution By Importer**

2      By its very terms, § 602 applies to importers of copyrighted works. Microsoft makes no claim

3  that Mak imported any copies at all. While this fact alone should suffice to dismiss Microsoft's claim

4  that Mak violated § 602(a), Microsoft's Motion for Summary Judgment makes clear that its recitation

5  of § 602(a) rights is nothing more than a red herring, intended to focus on whether a comment in

6  Justice Ginsburg's concurring opinion in *Quality King* is dispositive (though it does not even rise to

7  the level of *dicta*). But Microsoft's case does not rest on § 602 at all, despite its many references to

8  that section. Microsoft's case rests on a full frontal attack on § 109(a) by (a) contracting away the

9  statutory rights of owners of copies and (b) moving manufacturing operations overseas.

10      Nevertheless, although the fact that § 602 has no application at all to Microsoft's claims

11  against Mak, we shall discuss that point briefly, in the belief that by clearing away this red herring the

12  true issues in this case can be examined more clearly.

13

**E.      All Relevant Public Policy Considerations Favor Mak**

14      Other public policy and broader legal considerations favor Defendant. Where a copyright

15  owner seeks to extend its control beyond the limits imposed by Congress, the unique constitutional

16  justification for copyright protection no longer applies, and principles of First Amendment freedom,

17  antitrust laws, and copyright misuse come into play.

18

## II. MICROSOFT'S EFFORTS TO AVOID SECTION 109 ARE UNAVAILING

19      The central point at issue in the pending cross-motions for summary judgment is whether Mak

20  was the "owner" of the copies at issue here, and whether those copies were "lawfully made under this

21  title." Significantly, Microsoft does not contest Mak's ownership of non-infringing copies in the

22  ordinary sense. Rather, it argues that the ordinary owner is not the true owner because Microsoft

23  placed restrictions upon the rights Congress guaranteed to owners. Also, Microsoft argues that though

24  the copies were non-infringing in the sense that they were fully authorized by Microsoft, they are

25  nevertheless not made lawfully "under this title" because Microsoft directed that these particular

26  copies be manufactured in Ireland and Germany – that by adding "under this title" in § 109(a) of the

27  current Copyright Act 30 years ago, Congress meant for the historic first sale doctrine, recognized

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,        6
No. 3:07-cv-01840 EMC

1    since the mid 1800's and codified by Congress a century ago, to be nullified at the copyright owner's

2    choice by merely sending the manufacturing jobs offshore. We will take "ownership" and "under this

3    title" in turn.

## A.    Copyrights Are Subject to the Rights of Copy Owners

5        "Ownership" is the first operative term. Microsoft seeks to focus on whether its purported

6    licensing terms negate any sale, but § 109(a) does not require that a sale, much less a "first" sale, take

7    place. Rather, the privilege attaches to whoever owns the particular copy. *See, e.g., United States v.*

8    *Goss*, 803 F.2d 638, 643 (11th Cir. 1986) ("The effect of section 109(a) is that, if Goss owned a legally

9    made copy (*i.e.*, a legally made set of ROMs), he was entitled to sell or otherwise distribute such

10   ROMs."). When consumers lawfully reproduce Microsoft programs onto their hard drives from a CD

11   or by downloading, they continue to be owners of their hard drives even after the hard drives become,

12   by definition (§ 101), lawfully made copies of Microsoft's work, though no sale has occurred. Anyone

13   who buys a plastic disc onto which Microsoft's works are fixed at the direction of Microsoft becomes

14   the owner of a copy, with all of the rights attendant to ownership in the material object.[4]

### 1.    Microsoft Does Not Claim Ownership, Nor Dispute Defendant's Ownership, in the Normal Sense

        Rights of ownership of the material object in which the work is fixed, as distinct from the

17   copyright in the intangible work itself, is a concept rooted in § 202 and § 109(a) of the Copyright Act.

18   Section 109(a) entitles every owner of every copy of a Microsoft work "lawfully made under this title"

19   to resell it – or authorize others to do so – without Microsoft's consent. Microsoft does not allege that

20   the copies themselves are infringing reproductions. While it brandishes words like "trafficked" (in lieu

21   of "bought and sold"), and its agents, trained to spot infringing reproductions, conclude that the copies

---

[4] Section 106(3) grants the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." Section 101 further defines "copies" as follows:

> "Copies" are material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object, other than a phonorecord, in which the work is first fixed.

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,            7
No. 3:07-cv-01840 EMC

1  at issue here were "infringing" (as a legal conclusion, simply because they were sold without

2  Microsoft's permission), no allegation is made that the reproductions themselves were infringing.

3  Indeed, they trace the source to companies licensed by Microsoft to reproduce them, allegedly in

4  Ireland or Germany in facilities licensed by Microsoft to do so. Remick Decl. ¶ 8; Hawkes Decl. ¶¶

5  13-18 (both attached to Microsoft's Motion). Remick and Hawkes, in essence, claim to have traced the

6  chain of title from Microsoft's licensed manufacturer through to Mak and his company, "bought and

7  sold" all the way to their own eventual purchase of specific copies.[5]

8        Microsoft seeks to escape the application of § 109(a) by arguing that the owners are not

9  "owners" for purposes of § 109(a) because the *software* was licensed, not sold. This argument is

10  disingenuous. No one is suggesting that Microsoft "sold its *software*" if the term "software" refers to

11  the copyrighted work. Defendants readily concede that Microsoft remains the owner of its copyrights

12  no matter how many copies of its works it sells, and § 202 of the Copyright Act makes that clear. But

13  Microsoft itself admits to distributing copies of the software to entities it sought to obligate not to

14  distribute into the higher-priced market, where it could extract ten-fold higher prices, and later buying

15  them from Mak's company in proof that its distribution chain was leaky. Microsoft avoids saying, but

16  clearly concedes, that it parted with ownership of the copies in question.

17        Even without such concessions, Microsoft makes no attempt to present to this Court any

18  indicia of ownership in the material objects. In the Ninth Circuit, courts look behind the form to the

19  substance of a transaction in evaluating whether title has passed for purposes of § 109(a). *See United*

20  *States v. Atherton,* 561 F. 2d 747, 750 (9th Cir. 1977) ("licensing agreements" in reality transferred

21  ownership); *United States v. Wise,* 550 F.2d 1180, 1190-92 (9th Cir.), *cert. denied* 434 U.S. 929

22  (1977); *UMG Recordings, Inc. v. Augusto,* 2008 U.S. Dist. LEXIS 48689 (C.D. Cal. June 8, 2008). For

23  example, Microsoft does not purport to pay property taxes on the millions (or billions?) of discs it has

24  distributed worldwide. Microsoft does not claim to be carrying the risk of loss if a disc is damaged or

25

---

26  [5] Microsoft's Motion for Summary Judgment readily concedes that the copies in issue here have been bought and sold. For example, "the Surplus Computers Defendants bought and sold," at 6; "sold

27  Student Media," at 7; and "Mak personally participated in the acquisition" and signed numerous "purchase orders" to acquire it, at 8.

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,                    8
No. 3:07-cv-01840 EMC

1    destroyed. Microsoft claims no right to demand the return of "its property" from anyone in possession

2    of the material objects upon which its works are fixed. Microsoft does not allege that any of the

3    defendants stole the discs, nor that they obtained possession of them by any means other than payment

4    of the fair market price charged by the seller.

5         If "licensing" terms of the copyright owner can trump ownership of the material object, we end

6    up with an irrational outcome – that Microsoft can obtain a distribution right over every hard drive

7    onto which its works are reproduced, even if someone else owned the hard drive at the time of

8    reproduction. Congress did not intend for consumers to lose ownership of or freedom to sell their hard

9    drives merely because they downloaded the latest authorized software upgrade, patch or other

10    copyrighted work conditioned on giving up control of their property, or because they downloaded

11    while traveling outside the country. Nor can a self-serving license restriction expand the copyright

12    owner's distribution right to copies it no longer owns. *Bobbs-Merrill*, 210 U.S. 339.

13         **2.**    **No Right to License the *Private* Performance of a Work Exists**

14         Microsoft maintains that its copyrights were infringed because copies were sold to users

15    Microsoft had not licensed to use it. It only licensed people in certain geographic locations or people

16    involved in certain educational endeavors the right to "use" (*i.e.*, privately perform) the work from

17    copies labeled as "Student Media." Microsoft's argument is that by declaring that only a student in a

18    foreign country has its permission to operate a given program from a particular copy, the conveyance

19    of the copy to someone other than the licensed student renders the transfer of the material object

20    unlawful. Because Microsoft gave only certain people permission to operate its programs using those

21    copies, the argument goes, it infringes the distribution right to distribute those copies to "unlicensed"

22    users (even though no such private performance license is needed by anyone). This is a baseless claim

23    unsupported by any copyright anywhere in the world. No jurisdiction either in the U.S. or abroad

24    recognizes a copyright in private performances.

25         The Copyright Act does not give a copyright holder control over all uses of his
      copyrighted work.  Instead, [Section 106] of the Act enumerates several 'rights' that are
26    made 'exclusive' to the holder of the copyright. If a person, without authorization from
      the copyright holder, puts a copyrighted work to a use within the scope of one of these

27

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,     9
No. 3:07-cv-01840 EMC

'exclusive rights,' he infringes the copyright. If he puts the work to a use not enumerated in [Section 106], he does not infringe.

*Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 393-95 (1968) (footnotes omitted).

A private performance (*i.e.*, running a program on a personal computer) is not a use enumerated in Section 106, and therefore it does not infringe. Copyright owners enjoy an exclusive right to perform a work publicly, but have no right to exclude anyone from performing a work privately. *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 155 (1975). And, the person who runs a computer program needs no more of a license from the copyright owner than the person who reads a book before going to bed or sings a song in the shower. *Id*.

Moreover, the copyright owner's exclusive right over *public* performances and the user's unrestricted (and First Amendment protected) right to perform a work *privately* are both entirely independent of what particular copy the work is performed from, or whether it is performed from memory and without ever having seen a copy. § 202. Microsoft's legal sleight of hand is the legal equivalent of a record company insisting that only certain people are licensed to sing the recorded song in the shower, so it is illegal to sell the CD to unlicensed shower-singers.

### 3.    Licensing a "Work" Does Not Negate Ownership of a "Copy"

Microsoft argues that the copies in issue were "licensed, not sold," as though the two terms are mutually exclusive.  There is nothing mutually exclusive about selling copies (the tangible media) along with a license (pertaining to the intangible work), and Microsoft has itself been found to do so. "In most packages of software intended to be sold to an end-user, Microsoft includes a license, on a piece of paper, that provides that the end-user may install [*i.e.,* reproduce] the software onto one computer." *Microsoft Corp. v. Action Software*, 136 F.Supp 2d 735, 736 n.1 (N.D. Ohio 2001). "Plainly, a party who purchases copies of software from the copyright owner can hold a license under a copyright while still being an 'owner' of a copy of the copyrighted software," *DSC Communications Corp. v. Pulse Communications, Inc.,* 170 F.3d 1354 (Fed. Cir.), *cert. denied*, 528 U.S. 923 (1999) (concerning "owner" under § 117). Looking at the "economic realities of the particular arrangement," Microsoft itself was been denied its request, as a bankruptcy creditor, that licensed OEM

Defendant Mak's Response to Plaintiff's Motion for Summary Judgment and Mak's Cross-Motion for Summary Judgment, No. 3:07-cv-01840 EMC

10

1  reproductions be treated as licensed services rather than sales. *DAK Indus., Inc. v. Microsoft Corp.*, 66

2  F.3d 1091 (9th Cir. 1995). (DAK had paid a single fee for a license to install copies onto computers.)

3       The current 1976 Copyright Act requires only ownership of a lawfully made copy, and such

4  ownership may come into being without a sale, such as when the owner of the tangible medium (a

5  recordable disc or computer hard drive, for example) reproduces a copy onto it under license from the

6  copyright owner. *See United States v. Cohen*, 946 F.2d 430, 434 (6th Cir. 1991) ("This [first sale]

7  doctrine recognizes that copyright law does not forbid an individual from renting or selling a copy of a

8  copyrighted work which was lawfully obtained *or lawfully manufactured by that individual*"

9  (emphasis added)); *United States v. Sachs*, 801 F.2d 839, 842 (6th Cir. 1986); 2 M. Nimmer and D.

10  Nimmer, NIMMER ON COPYRIGHT § 8.12[B][3][c]. *See, also* U.S. Copyright Office, "DMCA Section

11  104 Report," 78 (2001) (physical copies of works in digital format, such as discs, and copies lawfully

12  made by downloading, are all subject to § 109).

13       **4.    Copyright Licenses Cannot Circumvent Statutory Limits**

14       Microsoft also takes the position that terms of its EULA purporting to specify who can use its

15  works give it the right to control performances of its works beyond the boundaries imposed by

16  Congress. Section 106(4) of the Copyright Act gives Microsoft the exclusive right "to perform the

17  copyrighted work publicly." Nothing in the Copyright Act gives any copyright owner any right over

18  the private performance of a work. Microsoft claims not only that right, but apparently also, the right

19  to limit § 109(a) distributions based on whether the person to whom the § 109(a) distribution was

20  made was "licensed" to perform the work privately.

21       "Using" computer software in the sense of executing the code that runs the Windows operating

22  system or the Microsoft Excel spreadsheet cannot be infringing so long as it is a private performance.

23  Doing so does not infringe any of the § 106 rights of the author. There is no rational basis upon which

24  a copyright owner could first purport to license only certain individuals to perform its works privately,

25  and then sue for infringement of the distribution right anyone who distributes a non-infringing

26  reproduction to an "unlicensed" individual who will engage in the wholly non-infringing act of

27  privately performing the work from that copy. Nor may Microsoft prohibit distributions to non-

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,          11
No. 3:07-cv-01840 EMC

1    students solely because Microsoft did not license non-students the right to engage in non-infringing

2    private performances it had no right to prohibit. Microsoft's insistence to the contrary "misconceives

3    the statutory definition of 'copies': 'work' and 'copy' are not synonymous terms; rather, a copy is the

4    material object in which the work is fixed." *United States v. Goss*, 803 F.2d 638, 642 (11th Cir. 1986).

5        A public performance of the "work" is, likewise, independent of the "copy" – if any – used to

6    perform it. For example, one who has been licensed to publicly perform a song may do so by playing

7    it from a musical score, playing it from a lawfully made CD, or singing it from memory. The rights

8    pertaining to the public performance of the intangible work are independent of whether anyone owns a

9    tangible copy, much less whether that copy was manufactured across the border. By conflating its

10   right to license the "work" and the separate establishment of title to a "copy" of the work, Microsoft

11   asks this Court to ignore the strictures of § 202 wherein Congress insists that the two be kept separate.

12   What is more, Microsoft is here attempting to license a private performance right it does not own, and

13   use that non-existing right as the leverage for dictating and restricting the commercial flow of copies it

14   does not own.

15       *Softman Prods. Co. v. Adobe Systems, Inc.*, 171 F. Supp 2d 1075 (C.D. Cal. 2001) is instructive

16   here. In that case, Adobe sought to use restrictive licensing to prevent retailers from separately selling

17   lawfully made copies of works that Adobe wanted to force them to sell as a bundle.

18       Adobe asserts that its license defines the relationship between Adobe and any third-
         party such that a breach of the license constitutes copyright infringement. This assertion
19       is not accurate because copyright law in fact provides certain rights to owners of a
         particular copy. This grant of rights is independent from any purported grant of rights
20       from Adobe. The Adobe license compels third-parties to relinquish rights that the third
         parties enjoy under copyright law.
21
         …. This license provision conflicts with the first sale doctrine in copyright law, which
22       gives the owner of a particular copy of a copyrighted work the right to dispose of that
         copy without the permission of the copyright owner.
23
24   *Id.* at 1083. The *Softman* court went on to reject the effort to trump § 109(a) rights with self-serving

25   licensing terms.

26       Softman is an "owner" of the copy and is entitled to the use and enjoyment of the
         software, with the rights that are consistent with copyright law. The court rejects
27       Adobe's argument that the EULA gives the purchasers only a license to use the
         software.
28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,          12
No. 3:07-cv-01840 EMC

1 | *Id.* at 1089.

2 | **B.    "Under This Title" Cannot Reasonably Mean "In The U.S.A."**

3 | If "lawfully made under this title" literally means "made on United States territory," as
4 | Microsoft claims, the results would be untenable, and would upset one hundred years of copyright
5 | jurisprudence. Microsoft's interpretation would mean that everyone would have to obtain the
6 | permission of the copyright owner to rent, sell, lend or give away every non-infringing copy of a work
7 | if that particular copy was manufactured offshore. The business traveler with a laptop, upon return to
8 | the United States from a foreign country, could not lawfully sell the laptop without first obtaining the
9 | permission of every copyright owner from whom the traveler received the latest computer program
10 | "update" or "patch", or a family photo downloaded with permission from a photo sharing website, or a
11 | copyrighted e-mail message, none of which would have been "made in the U.S.A." when reproduced
12 | onto the hard drive while out of the country. All such copies would be made with the authority of the
13 | copyright owner granted under § 106 but, according to Microsoft, because they became copies by
14 | virtue of being fixed in the hard drive while the hard drive was out of the country, the hard drive now
15 | falls within the scope of the § 106(3) distribution right and is immune from any § 109(a) limitation.

16 | Such interpretation flies in the face of standard industry and consumer practice, and would give
17 | copyright owners unprecedented power to control all retail, resale, barter, gift and lending practices
18 | under threat that any deviation could result in copyright infringement charges being filed against the
19 | perpetrator. Moreover, just as the *Quality King* case involved the distribution right not by virtue of the
20 | product being shampoo, but because the shampoo had a copyrighted label on it, Microsoft's
21 | interpretation would mean that manufacturers of consumer products which do not involve copyrights
22 | at all could gain copyright protection for all manner of restraints on sales by the mere act of having
23 | copyrighted labels printed overseas, imported, and then slapped onto the article. The potential results
24 | of such a reading would outrageous: Wholesale grocers of imported canned goods, for example, could
25 | be obligated to sell only to grocery stores licensed by the owner of the copyrighted label to sell the
26 | imported label. Not to be outdone, U.S. canneries could gain identical control over the distribution of
27 | their canned goods by simply having the labels printed across the border. The label "Made in the

28 |

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,
No. 3:07-cv-01840 EMC          13

1    U.S.A., but label printed in Mexico" would be an easy means to bring every article inside the labeled

2    package within the purview of the Copyright Act.

3        Justice Ginsburg's observation about the "round trip" nature of the distribution before the

4    Court in *Quality King* in no way suggests that the Court was hinting to L'anza that all it needed to do

5    to regain control over distribution and restrict sales of shampoo it no longer owned was to have the

6    labels printed overseas.

7        More importantly, Microsoft's reading of "under this title" to mean "in the U.S.A." is not

8    limited to the importation right, or to copies of computer programs. However this Court may interpret

9    the phrase "lawfully made under this title" in § 109(a), <u>that interpretation must apply to all copies of</u>

10   <u>any work whatsoever, including copies imported by or with consent of the copyright owner itself</u>.

11   Section 109(a) cannot be given Microsoft's interpretation half way, judicially rewriting it to mean,

12   "lawfully made in the U.S.A. unless the copyright owner has imported or authorized the importation

13   from the place of manufacture." If "under this title" means "made in the U.S.A.," then millions of

14   foreign films, newspapers, books and magazines, sound recordings, paintings, and even canned goods

15   and L'anza shampoo with a copyrighted label printed overseas, would lose the benefit of Section

16   109(a), subjecting the owners to civil and criminal copyright infringement claims if they disposed of

17   them by gift, sale or lending. It would cut across the entire spectrum of non-infringing copies that are

18   distributed by their owners. For example:

19   • The local library could not let patrons borrow books or magazines printed abroad, unless the

20     copyright owner licensed the distribution.

21   • The local video store could not choose whether to sell or rent the videos it buys if the copyright

22     owner manufactures the copies offshore, eliminating a right that has existed since the inception

23     of the home video rental industry back in the 1970s.

24   • The local record store would have to scour the packaging of a CD to determine where it was

25     manufactured.[6] Most state laws require that packaging contain the true name and address of the

---

[6] Despite arguing the significance of the place of manufacture in determining whether the seller of a disc is entitled by law to do so or subject to a statutory fine of $750 to $150,000 for every time a student lets a non-student use it, Microsoft does not bother to indicate the country of origin on its own

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,
No. 3:07-cv-01840 EMC                                    14

1    manufacturer, but not the place of manufacture.[7] If it does not say "made in the U.S.A.," any

2    transfer of possession would carry the risk of liability for infringement.

3    • A family having a garage sale would need to check the place of manufacture before selling

4      books, magazines, CDs, DVDs, or video games to passersby. Only those "made in the U.S.A."

5      could be sold. The others could not even be donated to charity without the copyright owner's

6      permission, since Section 106(3) applies to distribution "by sale <u>or other transfer of ownership</u>,

7      or by rental, lease, or lending."

8    Microsoft's reading would mean that publishers of copyrighted works – or of copyrighted labels

9    affixed to non-copyrightable goods – could simply take their reproduction operations offshore, and

10   thereby gain unheard of control over every future disposition of the article.

11        Significantly, it would not be enough for the purchaser to obtain non-infringing copies directly

12   from the copyright owner or through channels authorized by it. If they were manufactured offshore,

13   the copyright owner would get to decide which retailers could sell them, and to whom grandmothers

14   could bequeath their copy of their grandchild's haiku poem.

15        **1.    Not Extraterritorial Application of the U.S. Copyright Act**

16        Microsoft, and the weak authority on which it relies, places far too heavy an emphasis on

17   Justice Ginsburg's concurrence in *Quality King*, 523 U.S. at 154. But Justice Ginsburg's mere

18   observation that William Patry had commented that, because the Copyright Act does not apply

19   extraterritorially, "lawfully made under this title" must mean "lawfully made in the United States," is a

20   slender thread upon which to hang the conclusion (albeit reached in *Swatch S.A. v. New City, Inc.*, 454

21   F. Supp. 2d 1245 (S.D. Fla. 2006)), that the law is now settled on the basis of what a concurring

22   Justice said was categorically *not* settled, and illustrated by what an attorney might argue in the future.

23   _____

24   copies. *See* Exhibit 1, attached to Remick Decl., showing a photocopy of the material object of the
     type in question.

25   [7] *See, e.g.*, California Penal Code § 653w ("A person is guilty of failure to disclose the origin of a

26   recording or audiovisual work if … he or she knowingly advertises or offers for sale or resale, or sells
     or resells, or causes the rental, sale or resale, or rents, *or manufactures*, or possesses for these

27   purposes, any recording or audiovisual work, the cover, box, jacket, or label of *which does not clearly
     and conspicuously disclose the actual true name and address of the manufacturer thereof*").

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,
No. 3:07-cv-01840 EMC                                        15

1    The meaning of "lawfully made under this title" must focus, rather, on the Constitution's

2    Article I, Section 8 question, which is <u>whether the copyright owner exercised its exclusive right</u>.

3    "Lawfully made" is not a function of the physical process of reproduction or its location, but a

4    function of whether the reproduction was "authorized" by the copyright owner or by law (such as a

5    compulsory license under § 115). The Senate Report on the Copyright Act of 1976, 94th Cong., 2nd

6    Sess., Report No. 94-1476, at 79, explained it this way (emphasis added):

> To come within the scope of section 109(a), a copy or phonorecord must have been 'lawfully made under this title,' though not necessarily with the copyright owner's authorization. For example, any resale of an illegally 'pirated' phonorecord would be an infringement, but *the disposition of a phonorecord legally made under the compulsory licensing provisions of section 115 would not.*

10   For another example, § 121 of the Copyright Act authorizes the reproduction and distribution,

11   without the consent of the copyright owner, of copies in Braille for use by the blind or other persons

12   with disabilities. Nothing in § 121 limits the site of the reproduction to U.S. territory, yet this does not

13   mean that any Braille texts reproduced overseas are therefore infringing. The focus is on the source of

14   the authority to reproduce – either the author or the law – and not whether someone made the mistake

15   of reproducing an article in Braille for a blind friend while on vacation in Ireland instead of while at

16   home in Seattle.

17   The entire evolution of the first sale doctrine supports the conclusion that "lawfully made

18   under this title" means, simply, made with the copyright owner's permission or, if not with the

19   copyright owner's permission, then made under authority of United States law. What is excluded is

20   reproduction under authority of foreign law and without the permission of the copyright owner or the

21   U.S. Copyright Act. That excluded set of facts is not before us.

22   The first sale doctrine itself, prior to codification, developed without regard to where the copy

23   was manufactured. The only concern was whether the author had authorized the manufacture and

24   parted with title to the authorized copy. As *Quality King* established, Section 109(a) is a limitation on

25   Section 106 *ab initio*. The reproduction and distribution rights do not even come into being unless they

26   are exercised "subject to" Section 109(a). If "lawfully made under this title" means that the physical

27   place where "made" must be the United States, on the theory that otherwise the Act would be applied

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,
No. 3:07-cv-01840 EMC                                    16

1    extraterritorially, *a fortiori* the Section 106(1) reproduction right can only apply to the reproduction or

2    authorization to reproduce copies "in the U.S.A.;" *ergo*, when Microsoft authorized a replicator in

3    Ireland to manufacture the discs at issue in this case in Ireland rather than the United States, it could

4    not have been exercising its Section 106(1) right. That is, if Section 106(1) cannot be applied to

5    reproductions taking place overseas, then not even the copyright owner could claim that the copies

6    were "lawfully made under this title." Such a conclusion is irrational.

7         Interpreting copyrights (and their limitations) by balancing the author's right to authorize

8    reproductions against the public's interest in broad dissemination of authorized copies, regardless

9    where they were made, is more consistent with the approach taken by the Supreme Court when it

10   judicially recognized the first sale doctrine in *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908). [8] It is

11   also consistent with Congress' earliest codification in § 27 of the Copyright Act of 1909. Unconcerned

12   with the place of reproduction, § 27 began by noting the distinction between the right in the intangible

13   work and the right of ownership in the tangible reproduction, now codified in § 202 of the current Act,

14   and then provided, "nothing in this title shall be deemed to forbid, prevent, or restrict the transfer of

15   any copy of a copyrighted work the possession of which has been lawfully obtained." Finally, it is

16   more consistent with the present codification in § 109(a) of the Copyright Act of 1976, as noted above.

17        In short, the interpretation urged by Microsoft suggests an irrational Congress. The

18   empowerment of post-sale control over all re-distribution plus a total exemption from § 109(a) as a

19   reward for offshore manufacturing and the attendant loss of U.S. jobs cannot, by any stretch of the

20   imagination, be rationally related to a legitimate state interest. Moreover, it runs contrary to the

21   copyright policy expressed in the Constitution of encouraging broad dissemination of science and

22

23

---

24   [8] The Copyright Office has noted that the *Bobbs-Merrill* Court "drew a sharp distinction between the
     reproduction right and the right to vend. It noted, as a matter of statutory construction, that the
25   reproduction right was the 'main purpose' of the copyright law, and the right to vend [distribute]
     existed to give effect to the reproduction right. Since a grant of control of the copyright owner over
26   resales would not further this main purpose of protecting the reproduction right, the Court was
     unwilling to read the statue as providing such a grant." U.S. Copyright Office, "DMCA Section 104
27   Report," 20-21 (2001) (citations omitted).

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,
No. 3:07-cv-01840 EMC                                          17

1    useful art. Microsoft seeks to suppress such dissemination for the sole purpose of extracting monopoly

2    profits from artificially segregated markets by preventing price competition between them.[9]

### 2.    Microsoft's Interpretation Conflicts with Other Chapters of the Copyright Act

4        The interpretation of "lawfully made under this title" is at odds with two other provisions of

5    the Copyright Act. First, the Audio Home Recording Rights Act ("AHRA") contained in Chapter 10

6    (17 U.S.C. §§ 1001-1010) uses the same phrase. Known as "AHRA," it sets up a mechanism through

7    which royalties are collected on certain blank digital recording media and audio recording devices,

8    which royalties are to be distributed among certain "interested copyright parties" ostensibly harmed by

9    the provision in § 1008 that prohibits infringement actions based on the noncommercial making of

10   musical recordings by a consumer.

11       If Microsoft's interpretation of the language were applied in AHRA, it would mean that

12   copyright owners are not permitted to collect a share of the royalties if their sound recordings are

13   reproduced outside of the United States. Section 1006(a) provides that royalties are to be "distributed

14   to any interested copyright party (1) whose musical work or sound recording has been (A) embodied

15   in a digital musical recording or an analog musical recording lawfully made under this title that has

16   been distributed …) (emphasis added).[10] The Copyright Office itself seems to consider the words

17   "under this title" sufficiently superfluous as to omit them from its *DART Factsheet on Filing Claims*

18   *for Royalty Distribution*.[11] None of the forms prepared by the Copyright Office upon which an

19

20

___

21   [9] *See* U.S. Copyright Office, "DMCA Section 104 Report," 86 (2001) (footnote omitted), noting that
22   the first sale doctrine "appears to have been motivated as well by competition concerns – specifically,
     the ability of publishers to use their vending and distribution right to control not only the initial sale of
23   books, but the aftermarket for resales."

24   [10] *See, also,* Section 1001(7) (defining "interested copyright party" in part as "the owner of the
     exclusive right under section 106(1) of this title to reproduce a sound recording of a musical work that
25   has been embodied in a digital musical recording or analog musical recording lawfully made under
     this title that has been distributed").

26   [11] Available at http://www.copyright.gov/carp/dartfact.html. Under the heading "Who Can File a
27   Claim Form?" the Copyright Office, without comment, condenses the phrase "lawfully made under
     this title that has been distributed" in § 1006(a)(1)(A) to merely "lawfully made and distributed."

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,    18
No. 3:07-cv-01840 EMC

1    "interested copyright party" may claim its share of funds requires the interested party to limit its

2    claims to those copies made within the United States.[12]

3         Second, when Congress meant, "made in the U.S.A.," it knew how to say it. Section 601(a)

4    provides that until July 1, 1986, "the importation into or public distribution in the United States of

5    copies of a work consisting preponderantly of nondramatic literary material that is in the English

6    language and is protected under this title is prohibited *unless the portions consisting of such material*

7    *have been manufactured in the United States or Canada*." Significantly, when Congress decided to

8    sunset the provision, it was influenced by the argument that "The manufacturing clause violates the

9    basic principle that an author's rights should not be dependent on the circumstances of manufacture."[13]

10   It stands to reason that if the author's rights should not be dependent on where the author chooses to

11   make copies, so, too, should the statutory limitations on those rights not be so dependent.

12        This approach is consistent with the Copyright Office's own explanation of § 109(a), when

13   Congress asked it to examine § 109(a) in light of digital commerce:

14        Section 109 creates a two-prong test for eligibility for the privileges under
     section 109. First, the person must be the owner of the copy at issue. This applies to

15   ownership of the tangible item (e.g., a book, photograph, videocassette, CD, floppy
     disc, etc.) in which a copyrighted work is fixed. While ownership may be obtained by

16   virtue of a sale, this prong is also satisfied if ownership is obtained by virtue of gift,
     bequest, or other transfer of title. It does not apply to mere possession, regardless of

17   whether that possession is legitimate, such as by rental, or illegitimate, such as by theft.
     Nor does it refer to ownership of the copyright or of any of the exclusive rights.

18

19   ─────────────────────

20   [12] For a sample claim form, *see, e.g.,* Single Claim Form for DART Royalty Fees, available at
     http://www.copyright.gov/carp/dart/single_printable.pdf.

21   [13] H. Rep. 94–1476. The economic impact of encouraging overseas manufacturing at the expense of

22   U.S. publishers was also considered, and determined to have little impact, but enough to warrant a
     slow phase-out.

23        After carefully weighing these arguments, the Committee concludes that there is no
     justification on principle for a manufacturing requirement in the copyright statute, and

24   although there may have been some economic justification for it at one time, that
     justification no longer exists. While it is true that section 601 represents a substantial

25   liberalization and that it would remove many of the inequities of the present
     manufacturing requirement, the real issue is whether retention of a provision of this sort

26   in a copyright law can continue to be justified. The Committee believes it cannot.

27   *Id*.

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,    19
No. 3:07-cv-01840 EMC

Second, that copy must have been lawfully made. Ownership of <u>a copy that is not authorized by either the copyright owner or the law</u>, even if the owner is unaware of the piratical nature of the copy, does not permit the owner to avail himself of section 109. <u>Nothing in the statute limits the manner in which the making of the copy may be accomplished, so long as the resulting copy is lawful.</u>

The statute does not distinguish between analog and digital copies. Consequently, it does not matter whether the work is embodied in an analog videocassette or a digital DVD – <u>the copyright owner's distribution right with respect to that particular copy is extinguished once ownership of the copy has been transferred, and the new owner is entitled to dispose of that copy as he desires.</u>

U.S. Copyright Office, "DMCA Section 104 Report," 22-24 (2001) (citations omitted, emphasis added).

Whether "lawfully made under this title" encompasses copies made under a compulsory license imposed by a *foreign* state is not before this Court. The Supreme Court certainly seems to hold that one reason for the "under this title" qualifier was to exclude copies that, without the authority of the author, had been "lawfully made" under some compulsory scheme of a foreign state. Pointing out the flaws in the argument that the § 602(a) right would be superfluous if applied to non-infringing copies, Justice Stevens observed (among two additional points):

§602(a) applies to a category of copies that are neither piratical nor "lawfully made under this title." That category encompasses copies that were "lawfully made" not under the United States Copyright Act, but instead, under the law of some other country.

*Quality King*, 523 U.S. at 147. But on the narrow question of copies lawfully made under § 106(1) of this title, which are the only ones at issue here, there can be no doubt that § 106(1) entitles the author to license reproductions that take place abroad, and therefore, 109(a) applies. To put it succinctly, if this Court were to agree with Microsoft, then Microsoft would be powerless to prevent the distribution in the United States of pirated copies manufactured overseas, because its exclusive reproduction right would have to be exclusive only insofar as the unauthorized reproduction takes place in U.S. territory.

To the contrary, Microsoft did exactly what § 106(1) gives it the exclusive right to do: It made or authorized to be made the reproduction of its work into copies. Whether it made or authorized them to be made in the U.S., in Ireland, or on the moon, is wholly irrelevant to the question of whether it exercised its exclusive right, under § 106(1), to make them or have them made. The Copyright

Defendant Mak's Response to Plaintiff's Motion for Summary Judgment and Mak's Cross-Motion for Summary Judgment, No. 3:07-cv-01840 EMC

20

1    Office's interpretation – "authorized by either the copyright owner or the law" of the United States[14] –

2    requires no extraterritorial application, even if the copies authorized by the copyright owner are made

3    in Ireland or Germany.

4    **C.    Defendant Is Not Alleged To Have Imported**

5        It stands to reason that the prohibition against importation in Section 602(a) applies to those

6    who import. Accordingly, Microsoft's Motion for Summary Judgment fails because, even if § 602(a)

7    was not subject to § 109(a), Mak is not the importer. This error is so clear that perhaps this Cross-

8    Motion for Summary Judgment should have led off with this fundamental flaw in Microsoft's case.

9    Defendant's reluctance to do so is for this reason: Microsoft's § 602(a) claim is a red herring.

10        Microsoft purports to base its case on the premise that *Quality King* did not involve copies

11    manufactured abroad, but fails to note the fact that *Quality King* rested on the fact that the defendant in

12    that case was considered to be the importer, for purposes of that opinion. (Noting the "uncertainty"

13    whether the defendant was, in fact, the importer, the Court chose to rest its opinion on broader

14    principles, stating, "for the purpose of our decision, *we assume* that petitioner bought all three

15    shipments from the Malta distributor, *imported them*, and then resold them to retailers." 523 U.S. at

16    139 (emphasis added).) Here, this Court need cannot make that assumption, for Microsoft has not

17    alleged that Defendant Mak actually imported them.[15]

18        The Complaint alleges, in Paragraph 18, that John Doe defendants that Microsoft chooses not

19    to name – but clearly not Mak – imported the copies at issue here, and Paragraph 16 makes a vague

20    allegation of conspiracy among all of the defendants. Although Microsoft has learned through

21    discovery the identity of the well-known importer, and no evidence has surfaced suggesting Mak was

22    involved in any conspiracy to import, Microsoft's case does not rest on whether Mak or any other

23    defendant actually imported the copies. Rather, Microsoft's case rests entirely upon two legal theories

24    that have nothing whatsoever to do with whether § 602(a) is applicable.

25    

26    [14] U.S. Copyright Office, "DMCA Section 104 Report," 23 (2001).

27    [15] Microsoft learned the identity of the importer during discovery (if it did not know it already). The importer's identity is irrelevant, given that the importer is not before this Court.

28    

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,
No. 3:07-cv-01840 EMC
    21

First, Microsoft's claim of a right to control all distribution of all material objects in which its intangible work is fixed rests on the assertion that no one other the Microsoft can be the owner of lawfully made copies – for the simple reason that Microsoft "licenses" its "software". Microsoft also claims that, in any event, § 109(a) has no force or effect if the licensed reproduction took place overseas – not even if Microsoft itself authorized the importation. This argument has nothing to do with the importation right, under Microsoft's theory. Rather, Microsoft theorizes that the resulting copies, though clearly authorized by Microsoft in the exercise of its rights under § 106(1) of the Copyright Act, were not lawfully made under the Copyright Act because the Act does not have an extraterritorial reach (though Microsoft's § 106(1)-based authorization to the manufacturer in Ireland does reach Ireland). Thus, Microsoft's motion is not at all premised on whether Mak imported them. Indeed, Microsoft's two theories apply just as well (and just as unreasonably) even if Microsoft itself imported them and sold them to Mak's U.S. suppliers. Accordingly, defendants feel obligated to address Microsoft's true legal positions challenging the entire application of § 109(a) masquerading as a narrow question about importation rights.

## D.    Other Legal And Public Policy Considerations Favor Defendants

Copyright law does not exist in a vacuum. Born out of Article I, Section 8, of our Constitution, the purpose of the Copyright Act is to promote the progress of science and the useful arts. The purpose is not primarily to enrich copyright owners, nor to exclude copyright enforcement from the reach of the First Amendment's prohibition against suppressing speech, nor to ignore the public policy against restraints on alienation.[16] Three particular limitations in furtherance of the constitutional birthright warrant special note here.

---

[16] "The first sale doctrine was originally adopted by the courts to give effect to the early common law rule against restraints on alienation of tangible property." S. Rep. No. 162, 98th Cong., 1st Sess. 4 (1983).

### 1. Society's Interest in Enforcing Microsoft's Copyrights is No Greater than Society's Interest in Preventing Microsoft from Overreaching

The Supreme Court put it most clearly when it established that successful defendants are just as entitled to an award of costs and attorneys fees under Section 505 of the Copyright Act as are successful plaintiffs:

> Because copyright law ultimately serves the purpose of enriching the general public through access to creative works, it is peculiarly important that the boundaries of copyright law be demarcated as clearly as possible. To that end, defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement.

*Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 527 (1994). Applied to this case, society's interest in the widespread dissemination of copies made more affordable to a wider number of consumers because of the copy owner's right to redistribute them without the copyright owner's consent is just as important as is enforcement of the copyright owner's copyrights. Where the copyright owner's objective is to weaken § 109 rights to copy owners, we respectfully suggest that the public interest is unidirectional in favor of applying, undiluted, the rights Congress vested in owners of non-infringing copies. That is because the purpose of § 109 is not just to protect the interests of those who wish to dispose of their copies by gift or sale, but to bring art and science to those who can obtain copies more affordably because of the gifts and competitive, free market sales of others, and for whom Microsoft's tenfold price increase is unaffordable.

### 2. Copyright Holders Are Not Exempt From Antitrust Laws

If the manufacturers of blank discs were to discriminate in price among similarly situated buyers and enforce that price discrimination by requiring all purchasers of the lower cost goods to agree not to sell them in competition with the identical higher priced discs, there would be no question that a Sherman Act § 1 violation had occurred (and perhaps also a Robinson-Patman Act violation). The mere fact that the discs in question here fall under the definition of "copies" under Section 101 of the Copyright Act because a copyrighted work is fixed in them does not change that analysis.

Here, Microsoft seeks to impose a naked restraint on competition by artificially creating one higher-priced market for those who can pay top dollar and a lower-priced market for those who might

Defendant Mak's Response to Plaintiff's Motion for Summary Judgment and Mak's Cross-Motion for Summary Judgment, No. 3:07-cv-01840 EMC

23

1    otherwise be more inclined to meet their needs with free software, competing products, or perhaps

2    even pirated copies. It then seeks to prevent price competition from the lower cost market by entering

3    into agreements with overseas distributors to prevent them from being exploited by competitive

4    arbitrage wherein those who can afford top dollar choose to pay a lower price for an identical copy of

5    the identical work. We need not determine whether those agreements can be enforced in foreign

6    courts, or whether they could be prosecuted as Sherman Act felonies in domestic courts. What is clear,

7    however, is that no court should lend its aid to the misuse of the limited copyright to gain an anti-

8    competitive advantage that is so repugnant to our system of free competition protected by the Sherman

9    Act and other antitrust laws.

10           **3.    Microsoft is misusing its Copyrights**

11           By conditioning the sale of copies of its works on the purchaser's agreement not to exercise the

12    rights Congress gave all purchasers under Section 109 of the Copyright, Microsoft is engaged in

13    copyright misuse by enlarging the limited scope of its statutory rights. Microsoft has taken seriously

14    the humor in the old joke that, when the genie grants three wishes, your third wish should be "give me

15    unlimited wishes." When Congress gave Microsoft the exclusive right to distribute copies of its works

16    "subject to" the right of those new owners of the discs to redistribute them to others without

17    Microsoft's consent, Microsoft has replied, "Go ahead and limit our right to distribution to only the

18    copies we own. We simply won't distribute to anyone who does not agree to grant us back unlimited

19    distribution rights over the copies they own."

20           The remedy for such an abuse of its copyrights is to preclude Microsoft from enforcing them at

21    all until its ceases the misuse. *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990);

22    *Schloss v. Sweeney*, 515 F. Supp. 2d 1068, 1079-80 (N.D. Cal. 2007); *MGM Studios, Inc. v. Grokster,*

23    *Ltd.,* 454 F. Supp. 2d. (C.D. Cal. 2006) (citing Ninth Circuit other authority).

24                          **CONCLUSION**

25           This Court should find that copies made by or with the consent of Microsoft in the exercise of

26    its exclusive right under § 106(1) are not infringing no matter where made; that when Congress

27    expressly made all § 106 rights "subject to sections 107-122," it did not imply that copyright owners

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,                24
No. 3:07-cv-01840 EMC

1    could render § 106(3) "subject <u>only</u> to sections 107-108 and sections 109(b)-122, but <u>not</u> section

2    109(a)" by sending the manufacturing jobs offshore; and that whether Microsoft licensed any § 106(1)

3    copyrights in its computer programs is irrelevant to the central question here: whether anyone other

4    than Microsoft is the owner of the non-infringing copies. Microsoft cannot lawfully remove the limits

5    placed on its copyrights by shutting down U.S. manufacturing operations and moving them overseas.

6    Nor can it alter the reality of ownership in tangible copies with the stroke of a copyright licensing pen.

7    
     *Bill Weasley*: To a goblin, the rightful and true master of any object is the maker, not
     the purchaser. All goblin-made objects are, in goblin eyes, rightfully theirs.

8    

     *Harry Potter*: But if it was bought –

9    
     *Bill Weasley*: –then they would consider it rented by the one who had paid the money.

10        They have, however, great difficulty with the idea of goblin-made objects passing from
     wizard to wizard. … They consider our habit of keeping goblin-made objects, passing

11        them from wizard to wizard without further payment, little more than theft.

12   J.K. Rowling, HARRY POTTER AND THE DEATHLY HALLOWS 517 (2007). Microsoft's view of the world

13   is shared with the goblins of J.K. Rowling's imagination, but it is just as fictional.

14        For the foregoing reasons, Defendants respectfully request that Plaintiff's Motion for Summary

15   Judgment be denied, and that summary judgment be granted to Defendants together with an award of

16   their costs and attorneys fees in defending this action, pursuant to § 505 of the Copyright Act.

17        DATED this 18th day of August, 2008.

18   

19   Steven A. Dillick -- Bar No. 111419
    Law Offices of Steven A. Dillick

20   One Maritime Plaza, Suite 1600
    San Francisco, CA  94111
    sdillick@ix.netcom.com

21   (415) 399-8777

22   Attorney for Defendant
    Michael Mak

23   

24   

25   

26   

27   

28   

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,
No. 3:07-cv-01840 EMC

25

1

## CERTIFICATE OF SERVICE

2

I hereby certify that the foregoing document was served upon the following parties and/or

3

counsel of record, by the means designated below, this 18th day of August, 2008.

4

**Counsel for Plaintiff**

5

6

Paul J. Andre
Esha Bandyopadhyay
Perkins Coie LLP

7

101 Jefferson Drive
Menlo Park, California  94025-1114

8

Email: bande@perkinscoie.com

9

Scott T. Wilsdon
Jeremy E. Roller

10

Matthew A. Carvalho
Yarmuth Wilsdon Calfo PLLC

11

925 Fourth Avenue, Suite 2500
Seattle, Washington  98104

12

Email: wilsdon@yarmuth.com
        jroller@yarmuth.com

13

        mcarvalho@yarmuth.com

14

Attorneys for Plaintiff Microsoft Corporation

15

☒ Via Email

16

☐ Via Facsimile
☐ Via Federal Express

17

☐ Via Hand Delivery
☐ Via U.S. Mail

18

☒ Via ECF Notification

19

Steven A. Dillick

20

21

By  /s/Steven A. Dillick

22

     Steven A. Dillick

23

Attorney for Defendant
MICHAEL MAK

24

25

26

27

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,
No. 3:07-cv-01840 EMC

26

1   Steven A. Dillick -- Bar No. 111419
    Law Offices of Steven A. Dillick
2   One Maritime Plaza, Suite 1600
    San Francisco, CA  94111
3   sdillick@ix.netcom.com
    (415) 399-8777
4
    Attorney for Defendant
5   Michael Mak

6

7

8                      UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF CALIFORNIA
9                        SAN FRANCISCO DIVISION

10  MICROSOFT CORPORATION, a
    Washington corporation,                    CASE NO.  07-CV-01840 CW
11
                    Plaintiff,                  **[PROPOSED]**
12
          v.                                    **ORDER DENYING PLAINTIFF'S
13                                              MOTION FOR SUMMARY
    INTRAX GROUP, INC., d/b/a SURPLUS           JUDGMENT AND GRANTING
14  COMPUTERS; MICHAEL MAK; and                 DEFENDANT'S MOTION FOR
    JOHN DOES 1-5,                              SUMMARY JUDGMENT AS TO
15                                              DEDENDANT'S LIABILITY FOR
                    Defendants.                 COPYRIGHT INFRINGEMENT AND
16                                              AWARDING COSTS AND FEES TO
                                                THE PREVAILING PARTY**
17

18
          The Court, having been fully briefed on the parties' cross-motions for summary judgment on
19
    the question of Defendant's liability for copyright infringement, and having heard the arguments of
20
    counsel, and good cause appearing therefore, it is hereby ORDERED that Plaintiff Microsoft
21
    Corporation's Motion for Summary Judgment is hereby DENIED, that Defendant Michael Mak's
22
    Cross-Motion for Summary Judgment is hereby GRANTED, in light of the fact that the copies of
23
    Plaintiff's works in issue have been lawfully made by or under the authority of Plaintiff, were owned
24
    by Defendants at the time of the sales in question, and were therefore sold pursuant to Defendants'
25
    right under Section 109(a) of the Copyright Act to dispose of them without the consent of the
26
    copyright owner.
27

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,          1
No. 3:07-cv-01840 EMC

1    It is further ORDERED that Plaintiff's agreements and licensing restrictions intended to impair

2  Defendant's rights under Section 109(a) are against the public policy of the Copyright Act and

3  therefore void and unenforceable, and further, that Plaintiff's efforts to condition the initial

4  distribution of lawfully made copies on condition that Section 109(a) rights be waived constitutes a

5  misuse of Plaintiff's copyrights, and that Plaintiff's copyrights in the works fixed in the copies in

6  dispute shall not be enforced until such misuse is abated.

7    It is further ORDERED that Defendants are entitled, pursuant to Section 505 of the Copyright

8  Act, to their costs and reasonable attorneys fees in defending this action, that Plaintiffs shall pay the

9  same, and that Defendants shall submit a statement of their costs and fees to this Court within thirty

10  (30) days of this Order.

11    Having found for Defendants on these dispositive grounds, the Court dismisses all related

12  claims that may be pending.

13

14  Dated: _____                    _____

15                                             Hon. Claudia Wilken
                                               Judge, United States District Court

16

17  Presented by:
    Steven A. Dillick -- Bar No. 111419

18  Law Offices of Steven A. Dillick
    One Maritime Plaza, Suite 1600

19  San Francisco, CA  94111
    sdillick@ix.netcom.com

20  (415) 399-8777

21  Attorney for Defendant
    Michael Mak

22

23

24

25

26

27

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,    2
No. 3:07-cv-01840 EMC

1

## CERTIFICATE OF SERVICE

2

        I hereby certify that the foregoing document was served upon the following parties and/or

3

counsel of record, by the means designated below, this 18th day of August, 2008.

4

**Counsel for Plaintiff**

5

6

Paul J. Andre
Esha Bandyopadhyay
Perkins Coie LLP

7

101 Jefferson Drive
Menlo Park, California  94025-1114

8

Email: bande@perkinscoie.com

9

Scott T. Wilsdon
Jeremy E. Roller

10

Matthew A. Carvalho
Yarmuth Wilsdon Calfo PLLC

11

925 Fourth Avenue, Suite 2500
Seattle, Washington  98104

12

Email: wilsdon@yarmuth.com
        jroller@yarmuth.com

13

        mcarvalho@yarmuth.com

14

Attorneys for Plaintiff Microsoft Corporation

15

☒ Via Email

16

☐ Via Facsimile
☐ Via Federal Express

17

☐ Via Hand Delivery
☐ Via U.S. Mail

18

☒ Via ECF Notification

19

                                        Steven A. Dillick

20

21

                                        By  /s/Steven A. Dillick

22

                                            Steven A. Dillick

23

                                        Attorney for Defendant
                                        MICHAEL MAK

24

25

26

27

28

Defendant Mak's Response to Plaintiff's Motion for Summary
Judgment and Mak's Cross-Motion for Summary Judgment,          3
No. 3:07-cv-01840 EMC